# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 14, 2022                Decided June 21, 2022

No. 18-1209

NORTHSTAR WIRELESS, LLC AND SNR WIRELESS LICENSECO, LLC,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION,
RESPONDENT

T-MOBILE USA, INC.,
INTERVENOR

———

Consolidated with 18-1210, 20-1507, 20-1508

———

On Petitions for Review of and Notices of Appeal
from Orders of the Federal Communications Commission

———

*Catherine E. Stetson* argued the cause for petitioners. With her on the briefs were *Christopher J. Wright*, *Timothy J. Simeone*, *Daniel Tingley*, *Ari Q. Fitzgerald*, and *Michael J. West*.

*Bryan N. Tramont* and *Jennifer B. Tatel* were on the briefs for intervenor DISH Network Corporation in support of petitioners. *Joseph W. Lindsay* entered an appearance.

*Lawrence J. Spiwak* was on the brief for *amicus curiae* Phoenix Center for Advanced Legal and Economic Public Policy Studies in support of petitioners.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for respondent. With her on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, and *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*James P. Young, C. Frederick Beckner III*, *Christopher T. Shenk*, *Alice A. Wang*, *Russell H. Fox*, *Robert G. Kidwell*, *Bennett L. Ross*, and *Jeremy J. Broggi* were on the brief for intervenors AT&T Services, Inc., et al. in support of respondents. *Helgi C. Walker* entered an appearance.

Before: MILLETT and JACKSON\*, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In late 2014 and early 2015, petitioners Northstar Wireless, LLC ("Northstar"), and SNR Wireless LicenseCo, LLC ("SNR") placed more than $13 billion in winning bids at a Federal Communications Commission auction to license wireless spectrum. Because

---

* Circuit Judge Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

both Northstar and SNR were brand new companies with virtually no revenue, they each claimed the 25% discounts on their winning bids that the Commission offered in such auctions to very small businesses. After the auction concluded, though, the Commission determined that neither company was eligible for the very-small-business discount because both were *de facto* controlled by their biggest investor, the large telecommunications company DISH Network Corporation ("DISH").

Northstar and SNR (collectively, "Companies") petitioned for review of that decision. In 2017, we affirmed the Commission's order in part. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1025 (D.C. Cir. 2017). While we held that the Commission's decision to deny the discounts was generally sound, we found that agency precedent required the Commission to give the Companies a chance to cure the problems in their agreements with DISH. *Id.* This court remanded for the Commission to afford the Companies that opportunity. *Id.*

Back before the Commission, Northstar and SNR each modified their agreements with DISH in substantially identical fashion. After the Companies were afforded the opportunity to meet with Commission staff and some Commissioners, the Commission found that the Companies remained under DISH's *de facto* control and denied them the 25% discount on their bid prices. Northstar and SNR have again sought our review, contending that the Commission flouted this court's orders in *SNR Wireless* by not working closely enough with them to reduce DISH's control, wrongfully found them to be controlled by DISH, and penalized them without fair notice.

We reject the Companies' challenges to the Commission's orders. The Commission complied with our previous decision

by affording the Companies an opportunity to cure. The Commission also reasonably applied its precedent to the Companies and gave them fair notice of the legal standards that it would apply in analyzing their claims to be very small companies.

**I**

**A**

The Communications Act of 1934 tasks the Commission with regulating "all the channels of radio transmission"—that is, the electromagnetic spectrum used to send and receive wireless data. 47 U.S.C. § 301; *see also NTCH, Inc. v. FCC*, 950 F.3d 871, 874 (D.C. Cir. 2020) (per curiam). Because transmissions can interfere with one another when they are broadcast in the same portions of spectrum, the Commission "awards licenses to operate in specific frequency ranges, or 'bands.'" *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 843 (D.C. Cir. 2021) (citation omitted). Licensed companies can use spectrum to transmit content such as phone calls and videos.

In 1993, Congress gave the Commission the authority to license spectrum through competitive auctions. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002, 107 Stat. 312, 387–397 (codified at 47 U.S.C. § 309(j)). Congress directed the Commission, in designing its auction rules, to "promot[e] economic opportunity and competition * * * by disseminating licenses among a wide variety of applicants, including" small businesses. 47 U.S.C. § 309(j)(3)(B); *see also id.* § 309(j)(4)(D). At the same time, Congress directed the agency to avoid "unjust enrichment" and to allow for the "rapid deployment of new technologies, products, and services for the benefit of the public[.]" *Id.* § 309(j)(3)(C), (A).

Commission regulations encourage small businesses to participate in spectrum auctions by offering qualifying businesses "bidding credits[,]" which are discounts applied after an auction to reduce the cost of the acquired licenses. *See* 47 C.F.R. § 1.2110(a), (f) (2014).[1] To qualify for bidding credits, a business must show that its average revenues fall below threshold amounts set by the Commission. *Id.* § 1.2110(b)(1)(i), (f)(2).

Because acquiring and using wireless spectrum is expensive, small companies often rely on investments from larger, more established companies. *SNR Wireless*, 868 F.3d at 1044. To ensure that "bidding credits can only be used by genuinely small businesses—not by small sham companies that are managed by or affiliated with big businesses"—the Commission attributes to an applicant the revenues of any entity that *de facto* or *de jure* controls it. *Id.* at 1026; *see also* 47 C.F.R. § 1.2110(b)(1)(i), (c). Nonetheless, to allow small companies to participate in auctions, the Commission's Wireless Telecommunications Bureau ("Wireless Bureau") has granted some small businesses bidding credits even when they were subject to "extensive supervision" by their established investors. *SNR Wireless*, 868 F.3d at 1044.

Auction participants apply for bidding credits in a two-step process. *See United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 31–32 (D.C. Cir. 2022). Before the auction begins, a business seeking bidding credits must file a short-form application certifying that it qualifies for such credits. *See* 47 C.F.R. § 1.2105(a); *id.* § 1.2110(b). The Commission does not determine bidding credit eligibility before the auction. So a bidding credit applicant that chooses

---

[1] All regulatory citations are to the 2014 edition of the Code of Federal Regulations, which was in effect at the time of the auction at issue in this case.

to bid at auction "assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction." *Id.* § 1.2104(g)(2); *see also Auction of Advanced Wireless Servs. (Aws-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386, 8417 ¶ 101 n.180 (2014) ("*2014 Auction Notice*").

An applicant that wins a license in the auction and wishes to obtain bidding credits must then submit a more detailed, long-form application that the agency uses to assess whether the applicant is eligible for bidding credits. *See* 47 C.F.R. § 1.2110(j); *SNR Wireless*, 868 F.3d at 1027. If the Commission finds that a business does not qualify for bidding credits, the company must pay the full winning price on its licenses or face default penalties. *See* 47 C.F.R. §§ 1.2104(g)(2), 1.2109(c); *2014 Auction Notice*, 29 FCC Rcd. at 8417 ¶ 101 n.180, 8450–8451 ¶¶ 239–240. While the Commission uses bright-line rules to determine *de jure* control of the applicant companies, it assesses whether they are subject to *de facto* control by another entity "on a case-by-case basis." 47 C.F.R. § 1.2110(c)(2)(i). The Commission has established several guidelines to analyze this "highly contextual" question. *SNR Wireless*, 868 F.3d at 1026.

First, under a test announced in the agency's *Intermountain Microwave* decision, the Commission considers six factors, such as another entity's control over the small businesses' daily operations and major policy decisions, to determine whether the applicant is *de facto* controlled by that other entity. *See Intermountain Microwave*, 12 F.C.C. 2d 559, 559–560 (1963); *SNR Wireless*, 868 F.3d at 1030–1031.

Second, the Commission has said that an entity may still be considered independent even if a passive investor retains certain veto powers over the business's decisionmaking. *See*

*In the Matter of Implementation of Section 309(j) of the Commc'ns Act—Competitive Bidding*, 10 FCC Rcd. 403, 447–448 ¶¶ 80–81 (1994) (referred to as the "*Fifth Memorandum Opinion & Order*" or "*Fifth MO&O*"); *see also Baker Creek Communications, L.P.*, 13 FCC Rcd. 18709, 18714–18715 ¶ 9 (1998); s*ee also In re Stratos Glob. Corp.*, 22 FCC Rcd. 21328, 21343 ¶ 36 n.107 (2007) (full Commission adopting *Baker Creek*). A passive investor can "generally" play a role in a small business's major corporate decisions, such as the assumption of "significant corporate debt" and the sale of "major corporate assets[,]" without the Commission automatically deeming the investor to be in *de facto* control. *Fifth MO&O*, 10 FCC Rcd. at 448 ¶ 81. Still, the Commission has been explicit that "the aggregate effect of multiple" investor protections could be sufficient to find a small business under the *de facto* control of the investor. *Id.* at 449 ¶ 82.

Third, the Commission advised, in its *Fifth Memorandum Opinion & Order*, that it will closely scrutinize applicants' "put options"—that is, their right to sell themselves to investors. *Fifth MO&O*, 10 FCC Rcd. at 455–456 ¶¶ 95–96. Although such rights may appear to give small businesses control over future mergers, the Commission has explained that put options may be combined with other terms to "financially * * * force the [small business] into a sale (or major refinancing)[.]" *Id.* at ¶ 96. In such a case, the Commission will deem the small business *de facto* controlled from the time of the auction. *Id.*; *see also* 47 C.F.R. § 1.2110(c)(2)(ii)(A)(*2*).

**B**

**1**

In 2014, the Wireless Bureau announced an upcoming auction for companies to bid on more than 1,600 spectrum licenses. *See 2014 Auction Notice*, 29 FCC Rcd. 8386. The

agency offered bidding credits covering 25% of the cost of licenses to those winning bidders that had "attributed average annual gross revenues" of $15 million or less over the prior three years. *Id.* at 8412 ¶ 82. The Bureau then referred interested bidders to Commission regulations, as well as the *Intermountain Microwave* and *Baker Creek* orders, for guidance on the agency's *de facto* control standards for bidding-credit applications. *Id.* at 8412–8413 ¶¶ 84–86 & n.151.

Seventy entities qualified to compete in the auction, which ran between late 2014 and early 2015. *See Auction 97: Advanced Wireless Services (AWS-3)*, FCC (2020), https://www.fcc.gov/auction/97 (last accessed June 13, 2022). The winning bids totaled more than $41 billion. *Id.*

Among the biggest winners were SNR and Northstar, two "small companies that were formed just in time to file short-form applications" to participate in the auction as very small businesses. *SNR Wireless*, 868 F.3d at 1027. At the time they filed their short-form applications, both companies "lacked officers, directors," and virtually any revenue. *Id.*; *see also In re Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8910–8911 ¶ 53 (2015) ("*2015 Order*"). Northstar and SNR did, though, have one very large investor: DISH, which held an 85% stake in each company. *See 2015 Order*, 30 FCC Rcd. at 8893–8894 ¶¶ 14, 17; *see also id.* (noting that DISH holds its shares in the Companies through wholly owned subsidiaries). DISH (i) managed the Companies' businesses, (ii) was their principal investor and creditor, (iii) retained the power to veto important corporate decisions, and (iv) coordinated its own bidding strategy in the auction with the Companies. *Id.* at 8896–8897 ¶¶ 21, 23; *SNR Wireless*, 868 F.3d at 1027. Northstar and SNR

both described DISH as holding "non-controlling interests" in the Companies.[2]

Together, the newly formed and effectively revenue-less Northstar and SNR won 43.5% of all the licenses in the auction, and their winning bids collectively added up to $13.3 billion. *2015 Order*, 30 FCC Rcd. at 8888 ¶ 3. Collectively, the licenses would together give the Companies spectrum rights "cover[ing] the entire United States." *Northstar Wireless, LLC*, 35 FCC Rcd. 13317, 13345 ¶ 84 n.191 (2020) ("*2020 Order*"). DISH financed approximately 98% of the Companies' winning bids. *2015 Order*, 30 FCC Rcd. at 8924 ¶ 84.

**2**

Shortly after the auction, Northstar and SNR each filed long-form applications seeking to obtain very-small-business bidding credits worth approximately $3.3 billion. *SNR Wireless*, 868 F.3d at 1027–1028; *2015 Order*, 30 FCC Rcd. at 8891 ¶ 10 nn.15–16. Over the next three months, SNR and Northstar repeatedly amended their filings in response to requests from Commission staff for more information. *2015 Order*, 30 FCC Rcd. at 8891 ¶ 10 nn.15–16, 8949 ¶ 151 n.431.

Several parties petitioned the Wireless Bureau to deny the Companies bidding credits. *See 2015 Order*, 30 FCC Rcd. at 8889 ¶ 4 & n.7, 8900 ¶ 30. In July 2015, officials from the Wireless Bureau, the Office of General Counsel, and the offices of all five Commissioners met with SNR, Northstar, and

---

[2] SNR Wireless LicenseCo, LCC, FCC Form 175 Exhibit A, Auction File No. 0006458318 (Sept. 12, 2014), at 6; *accord* Northstar Wireless, LLC, FCC Form 601 Exhibit A, ULS File No. 0006670613 (Feb. 13, 2015), at 13 (referring to DISH's "noncontrolling interest").

other interested parties to lay out the Commission's concerns with the applications.[3]

In August 2015, the Commission issued an order finding that DISH *de facto* controlled Northstar and SNR. *See 2015 Order*, 30 FCC Rcd. at 8889 ¶ 4. And because DISH had more than $13 billion in average annual revenue in the three years prior to the auction, the agency denied the Companies' request for very-small-business bidding credits. *Id.*

The Commission rested its decision on several findings relevant here. First, the agency concluded that DISH's investor protections swept more broadly than the "typical" protections outlined in *Baker Creek*. *2015 Order*, 30 FCC Rcd. at 8913 ¶¶ 60–61. Particularly concerning to the agency was the fact that DISH held several levers to tightly constrain the Companies' spending. *Id.* at 8916 ¶ 64, 8918 ¶ 67. Because the Companies would need to expend large sums to roll out the nationwide wireless network needed to support the acquired licenses, those spending controls placed DISH firmly in the driver's seat. *Id.* at 8918 ¶ 67.

Second, the agency found that DISH controlled the Companies in all six ways identified in *Intermountain Microwave*. *See 2015 Order*, 30 FCC Rcd. at 8918–8928 ¶¶ 69–99. Not only did DISH possess strong contractual rights to control Northstar and SNR's decisions, but it had also agreed

---

[3] *See* Letter from Jean L. Kiddoo, Deputy Bureau Chief, Wireless Telecomm. Bureau, to Marlene H. Dortch, Sec'y, FCC (July 22, 2015), https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp;ATTACHMENTS=BhrpvT1PbTmyhR53DRfGLDpJs0hZ21zkr6xC4kFmZns1cC0KPMwS!1071318750!560130442?applType=search&fileKey=1174580406&attachmentKey=19721827&attachmentInd=applAttach ("2015 Kiddoo Letter") (last accessed June 13, 2022).

in its Management Services Agreements with the Companies to "build out, manage, and operate [the Companies' wireless] network[s.]" *Id.* at 8919 ¶ 71; *see also id.* at 8935–8936 ¶ 117. Additionally, the Companies were barred from paying any of their employees more than $200,000 a year without DISH's permission, and DISH could hire and fire a wide range of workers in its capacity as manager. *Id.* at 8915 ¶ 61, 8922 ¶¶ 80–81. DISH also could channel most of the Companies' profits to itself and so ensure that SNR and Northstar depended on it for future funding. *Id.* at 8924–8925 ¶¶ 85, 89. The Commission was further concerned about DISH's power to dictate the Companies' "use of their licenses" and the "fundamental choice of whether to remain in operation." *Id.* at 8927 ¶ 94. The Companies' failure to compete with one another at the auction—instead operating in tandem to make bids that advanced DISH's interests—underscored their subordinate relationship to DISH. *Id.* at 8931–8934 ¶¶ 109–114.

Third, the Commission found that SNR and Northstar's put options were designed to force the Companies to sell themselves to DISH. *2015 Order*, 30 FCC Rcd. at 8928–8931 ¶¶ 100–105. The agency observed that DISH could prevent the Companies' managers from selling their interests to anyone else for 10 years. *Id.* at 8928–8929 ¶ 101. With the Companies hemmed in, DISH made them offers they could hardly refuse. In particular, the agreements with DISH gave SNR and Northstar a single 30-day window each to exercise their put options, be bought out by DISH at a guaranteed rate of return, and walk away debt free. *Id.* at 8929–8930 ¶ 103. If they turned that deal down, the Companies would face billions of dollars of debt due within two years with far too little revenue to pay it. *Id.* at 8930 ¶ 104. That framework closely mirrored a scenario the Commission had previously indicated could well

constitute a *de facto* transfer of control. *Id.* at 8930–8931 ¶ 105 (quoting *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96).

Having found the Companies ineligible for bidding credits, the Commission applied its written policies to require the Companies to pay the full price for their licenses or face default penalties. *2015 Order*, 30 FCC Rcd. at 8951 ¶ 156, 8949–8951 ¶¶ 152–155. The Commission did not give the Companies an opportunity to fix the control issues the agency had identified. *See SNR Wireless*, 868 F.3d at 1028.

Northstar and SNR agreed to buy some of the licenses they had won and defaulted on others. *See 2020 Order*, 35 FCC Rcd. at 13324 ¶ 23 & n.43. As to the defaulted licenses, the Commission ordered the Companies to pay any shortfall between their winning bids and the price the agency obtained for those licenses in future auctions, as well as a penalty of 15% of either the winning bid in the original auction or a subsequent winning bid by a new purchaser, whichever is less. *SNR Wireless*, 868 F.3d at 1029; *see also* 47 C.F.R. § 1.2104(g)(2)(ii); *2014 Auction Notice*, 29 FCC Rcd. at 8451 ¶ 240. While the final amount they owe in penalties has not yet been determined, the Companies already have paid the Commission hundreds of millions of dollars in interim fees. *See SNR Wireless*, 868 F.3d at 1029.

**3**

Northstar and SNR sought review of the Commission's order in this court. *See SNR Wireless*, 868 F.3d at 1029. We upheld the agency's finding that DISH exercised *de facto* control over both companies, explaining that the Commission's "pragmatic application of *Intermountain Microwave*" comported with its precedent and supported denying the Companies bidding credits. *Id.* at 1033–1034.

We also upheld the Commission's determination that the Companies' put options, in combination with their debt obligations, gave them no practical choice but to sell themselves to DISH just five years after acquiring their licenses. *See SNR Wireless*, 868 F.3d at 1034–1035. Because DISH could prevent Northstar and SNR from borrowing enough money to build a wireless network, or from selling their businesses to a third party, neither company could hope to pay off its multi-billion-dollar debt. *Id.* That left the Companies with "only one path to avoiding certain financial failure:" sell themselves to DISH in the contractually provided single time frame before their immense loans came due. *Id.* The *Fifth Memorandum Opinion & Order* had warned applicants that such an arrangement could result in a finding of *de facto* control. *Id.* at 1035.

This court also rejected the Companies' argument that the Commission arbitrarily departed from previous *de facto* control decisions by its Wireless Bureau, because the Bureau's unexplained rulings did not bind the agency as a matter of law. *See SNR Wireless*, 868 F.3d at 1035–1042.

But we agreed with SNR and Northstar that they lacked fair notice that the agency would deny them a chance to cure the control issues it had identified. *See SNR Wireless*, 868 F.3d at 1043–1046. While Commission precedent had given the Companies fair notice of the control standards it applied in denying them bidding credits, we held that the agency failed to warn them that they would be denied an "opportunity to cure" any control problems before being subjected to the Commission's remedies. *Id.* at 1025. We then ordered the Commission to provide "an opportunity for [the Companies] to renegotiate their agreements with DISH[,]" but added that "[n]othing in our decision requires the [Commission] to permit a cure." *Id.* at 1046.

**4**

Following this court's decision, Northstar and SNR wrote to Commission staff seeking to negotiate an agreement that would allow them to receive the very-small-business bidding credits. The agency did not respond. Instead, in January 2018, the Wireless Bureau issued an order laying out its procedures for the remand. *See In re Northstar Wireless, LLC*, 33 FCC Rcd. 231 (2018). Under that plan, the Bureau gave the Companies time to revise their agreements with DISH and re-file a request for very-small-business bidding credits. *Id.* at 232–233 ¶¶ 5–6. Interested third parties could then comment on the filings, and SNR and Northstar would have another chance to revise their agreements in response. *Id.* at 233–234 ¶¶ 7–8.

The Companies appealed the Bureau's order to the Commission. They argued, as relevant here, that this court's decision and agency precedent required the Commission on remand to engage in "iterative, responsive negotiation[s]" with SNR and Northstar to "cure the [Commission's] *de facto* control concerns." Joint Appendix ("J.A.") 377.

The Commission affirmed the Bureau's order in relevant part. *See In re Northstar Wireless, LLC*, 33 FCC Rcd. 7248 (2018) ("*Remand Procedures Order*"). The agency ruled that our decision did not require it to work directly with the Companies to formulate a cure. Instead, all the agency had to do was give Northstar and SNR the opportunity to renegotiate their agreements with DISH to come into compliance with Commission standards. *Id.* at 7251–7252 ¶¶ 10–12. That, the Commission said, was exactly what the Bureau's procedure allowed. *Id.* at 7254 ¶ 16.

15

In August 2018, the Companies timely sought our review and, at the request of the parties, we held the case in abeyance pending further action by the Commission.

Meanwhile, by June 2018, SNR and Northstar had revised their agreements with DISH and submitted new applications for very-small-business bidding credits. Three parties opposed the Companies' application, all of whom have since intervened in this case. *See 2020 Order*, 35 FCC Rcd. at 13327–13328 ¶ 34. The Companies responded and filed an expert report arguing that "SNR and Northstar each have viable potential business options regarding the use of their respective [spectrum] licenses." J.A. 1548 (Declaration of Carlyn R. Taylor).

In November 2020, SNR and Northstar made their case for bidding credits during virtual meetings with Commissioners Carr, Rosenworcel, Starks, and members of their staff, a member of Commissioner O'Rielly's staff, and an attorney advisor from the agency's Office of General Counsel.[4] At those meetings, the Companies answered questions about the nature of their new agreements, and they then supplemented their responses in letters filed with the Commission.[5]

---

[4] *See* Letter from Ari Q. Fitzgerald, Counsel to SNR Wireless LicenseCo, LLC, and Mark F. Dever, Counsel to Northstar Wireless, LLC, to Marlene H. Dortch, Sec'y, FCC (Nov. 4, 2020) ("November 4 Meeting Letter"), J.A. 1592; Letter from Ari Q. Fitzgerald, Counsel to SNR Wireless LicenseCo, LLC, and Mark F. Dever, Counsel to Northstar Wireless, LLC, to Marlene H. Dortch, Sec'y, FCC (Nov. 17, 2020), J.A. 1616 ("November 17 Meeting Letter").

[5] *See* November 4 Meeting Letter, at J.A. 1592–1599; November 17 Meeting Letter, at J.A. 1616–1627.

Later that month, the Commission found that the attempted cure had not taken: DISH remained in *de facto* control of SNR and Northstar. *See 2020 Order*, 35 FCC Rcd. at 13318 ¶ 5.

In reaching that conclusion, the Commission acknowledged that the Companies and DISH had changed their agreements in several ways. *See 2020 Order*, 35 FCC Rcd. at 13326–13327 ¶ 32. For example, the amendments generally diminished DISH's ability to veto outright some of the Companies' major business decisions. *Id.* at 13339 ¶ 66. The parties also eliminated the Management Services Agreements, gave the Companies the authority to pay employees as they saw fit, and expanded the number of decisions SNR and Northstar could make without consulting DISH. *Id.* at 13326–13327 ¶ 32, 13342 ¶ 79. Finally, the new agreements reduced SNR and Northstar's debt obligations and gave them a second opening in which to sell themselves to DISH for a guaranteed profit. *Id.* at 13326–13327 ¶ 32.

The Commission nevertheless held that DISH was still in *de facto* control of both Companies for two independent reasons.

First, applying *Intermountain Microwave* and *Baker Creek*, the Commission found that DISH retained its power to dominate SNR and Northstar by controlling their access to capital and revenue. *2020 Order*, 35 FCC Rcd. at 13318–13319 ¶¶ 6–7. The fact that the Companies negotiated substantially identical agreements on remand bolstered this conclusion. *Id.* at 13319 ¶ 8.

Second, under the *Fifth Memorandum Opinion & Order* the Commission found that Northstar and SNR's put options, considered alongside their financial obligations and DISH's investor protections, remained "virtually certain to entice" the Companies to sell themselves to DISH. *2020 Order*, 35 FCC

Rcd. at 13319–13320 ¶ 11 (quoting *SNR Wireless*, 868 F.3d at 1035).

Northstar and SNR filed timely notices of appeal and petitions for review.

While the petitions and notices of appeal were pending, the parties advised the court that non-DISH investors in SNR and Northstar began selling their shares. In late 2020, DISH acquired all but three percent of Northstar's outstanding common shares from Northstar's managing shareholders.[6] The following year, SNR shareholders exercised their right to sell the company to DISH.[7] And shortly after oral argument, DISH agreed to extend Northstar's right to sell itself—which was set to expire on January 25, 2022—to July 24, 2022.[8]

---

[6] *See* AT&T *et al.* Br. 10–11; DISH Network Corporation Form 10-Q, SEC (Nov. 4, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001001082/000 155837021014419/dish-20210930x10q.htm, at 10 (last accessed June 13, 2022).

[7] *See* DISH Network Corporation Form 8-K, SEC (Nov. 19, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001001 082/000100108221000023/dish-20211115x8k.htm, at 2 (last accessed June 13, 2022); Letter from Maureen K. Flood, Counsel, FCC, to Mark Langer, Clerk, U.S. Court of Appeals for the District of Columbia Circuit (March 22, 2022); Oral Arg. Tr. 6:12–17.

[8] *See* Letter from Maureen K. Flood, Counsel, FCC, to Mark Langer, Clerk, U.S. Court of Appeals for the District of Columbia Circuit (March 1, 2022). *Compare also* Third Amended and Restated Limited Liability Company Agreement of Northstar Spectrum, LLC by and Between Northstar Manager, LLC and American AWS-3 Wireless II L.L.C. (June 7, 2018), § 8(a), J.A. 679,

18

**II**

Northstar and SNR filed timely notices of appeal under 47 U.S.C § 402(b) and petitions for review under 47 U.S.C. § 402(a). "Because we plainly have jurisdiction by the one procedural route or the other, we need not decide which is the more appropriate vehicle for our review." *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014) (internal quotation marks and citation omitted) (finding jurisdiction without deciding whether it vested through a petition for review under 47 U.S.C. § 402(a) or a notice of appeal under 47 U.S.C. § 402(b)).

We must affirm the Commission's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Our approach is "deferential," and our task is "simply [to] ensure[] that the agency has acted within a zone of reasonableness"— that is, to determine whether the agency "reasonably considered the relevant issues and reasonably explained [its] decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

---

*with* First Amendment to the Third Amended and Restated Limited Liability Company Agreement of Northstar Spectrum, LLC, FCC (Jan. 24, 2022), https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=1843738938&attachmentKey=21418597&attachmentInd=applAttach (last accessed June 13, 2022).

19

**III**

**A**

**1**

Northstar and SNR argue that the Commission violated our remand order by declining to negotiate iteratively with the companies over how to secure their *de facto* independence from DISH. We disagree. The agency was under no such obligation.

As we explained in *SNR Wireless*, because the Commission's guidelines for *de facto* control are fact intensive and weigh multiple criteria, the Commission has sometimes provided applicants "a chance to cure" control problems identified by the agency. *SNR Wireless*, 868 F.3d at 1045 (citing *In re Application of ClearComm, L.P.*, 16 FCC Rcd. 18627 (2001)). It is that same "chance to cure" that we ordered the Commission to provide the Companies on remand. Nothing more and nothing less.

The Commission followed that directive. The Commission gave the Companies an "opportunity * * * to renegotiate their agreements with DISH" and then apply again for the very-small-business bidding credits they sought. *SNR Wireless*, 868 F.3d at 1046; *see Remand Procedures Order*, 33 FCC Rcd. at 7253 ¶ 13. Northstar and SNR had the chance to revise their contracts with DISH in light of the detailed guidance they had received from not only prior agency precedent, but also a unanimous Commission decision in their own case, and this court's lengthy analysis of the concerns with their prior agreements. *See Remand Procedures Order*, 33 FCC Rcd. at 7255 ¶ 20; *see also 2015 Order*, 30 FCC Rcd. at 8887–8953; *SNR Wireless*, 868 F.3d at 1029–1042. Together,

that afforded the Companies adequate guidance for eliminating DISH's *de facto* control.

Contrary to the Companies' argument, neither the Commission's decision in *In re Application of ClearComm, L.P.*, 16 FCC Rcd. 18627 (2001), nor our discussion of it, *see SNR Wireless*, 868 F.3d at 1045–1046, required more of the Commission. In *ClearComm*, a small business transferred its licenses to NewComm, a corporation created with funding from a large telecommunications company. 16 FCC Rcd. at 18627–18630 ¶¶ 1–5. Commission staff asked the parties questions about their agreements and, after receiving responses, "raised further questions regarding whether certain" elements of the contracts gave the investor control over NewComm. *Id.* at 18631 ¶ 7. The parties submitted proposed revised agreements "to explicitly address the control concerns[,]" and followed up with executed contracts. *Id.*

Likewise, the Commission here explained its control concerns to the Companies in detail and gave them a chance to establish their independence consistent with that guidance and this court's analysis. *Compare Remand Procedures Order*, 33 FCC Rcd. at 7255 ¶ 20, *with ClearComm*, 16 FCC Rcd. at 18631 ¶ 7. The main difference between the two cases is that the agency here also gave the Companies a lengthy opinion issued by the Commission itself to guide its renegotiations, rather than just interactions with agency staff, and Northstar and SNR had the benefit of additional guidance from a federal court of appeals. On top of that, the Companies had engaged in a back-and-forth with agency staff before the Commission accepted their initial long-form applications, *see Remand Procedures Order*, 33 FCC Rcd. at 7256 ¶ 22, and on remand met with the majority of Commissioners to defend their

amended agreements.[9]  Rather than a "second shot in the dark[,]" Companies Opening Br. 26, the Companies enjoyed a well-lit path to a cure.

The Companies contend that we ordered both that they be permitted to renegotiate with DISH *and* that Commission staff engage directly in back-and-forth discussions with them.  That is not what we said.  Our prior ruling gave the Companies "an opportunity to negotiate a cure[,]" which was to consist of "an opportunity to renegotiate their agreements with DISH[.]" *SNR Wireless*, 868 F.3d at 1046.  That was "*the* appropriate remedy" ordered.  *Id.* (emphasis added).  Counsel for the Companies even acknowledged at oral argument that "precise language [requiring] negotiating with staff, of course, isn't in the opinion[.]"  Oral Arg. Tr. 29:4–6.  In other words, our remand order required only that the Companies be allowed the opportunity for a cure, not that Commission staff prescribe the cure.

**2**

It is black-letter law that agencies must treat like parties alike.  The Companies argue that the Commission failed to do so by denying them the kind of repeated staff negotiations the agency had provided to address control problems in the past. The record does not bear out that claim.

First, the Companies are comparing apples to oranges. That is because, "prior to any cure opportunity, [SNR and Northstar] had extensive information about the Commission's views on the ways in which their initial Applications were defective" right from the Commission's mouth, along with this court's "point-by-point elaboration of the Commission's

---

[9] *See* November 4 Meeting Letter, *supra*, and November 17 Meeting Letter, *supra*.

analysis[.]" *Remand Procedures Order*, 33 FCC Rcd. at 7255 ¶ 20; *see also id*. at 7255–7256 ¶ 21. The Companies identify no other entity that has been given that same amount of individualized and on-point guidance about the basis for the Commission's *de facto* control finding.

For the same reason, the Companies get no help from the Commission's observation that agency "staff has usually undertaken discussions" with bidding credit applicants "in order to obtain revisions to agreements" and ensure their independence. *In re Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd. 4753, 4769 ¶ 43 (2006). The Companies did better by getting guidance directly from the Commissioners themselves.

Anyhow, the Companies have had extensive interactions with agency staff. In 2015, Commission staff reached out to the Companies to obtain additional information and allowed them to update their applications repeatedly in response, much as SNR and Northstar say the agency has done with prior applicants. *Compare 2015 Order*, 30 FCC Rcd. at 8949 ¶ 151 n.431, *with* Companies Opening Br. 31–32 & nn.11–13 (citing instances in which Commission staff asked applicants questions about their bidding-credit eligibility). Top-level Commission officials, including representatives from the offices of all five Commissioners, also met with SNR and Northstar to explain the agency's view of their initial agreements with DISH.[10] Not only did the Companies interchange their submissions with agency staff, but on remand they were given the opportunity to field live questions about their amended agreements from the majority of sitting

---

[10] *See* 2015 Kiddoo Letter, *supra*.

Commissioners.[11]  The Companies were hardly shortchanged in Commission attention and advice.

At bottom, the Companies' argument presupposes an obligation on the part of the Commission to map out the precise details of an arrangement with DISH that would pass muster. That is not how the process works.  The Companies bid at the auction only after first agreeing to pay the full price for acquired spectrum licenses even if they were ultimately denied very-small-business bidding credits.  *See* 47 C.F.R. §§ 1.2104(g)(2), 1.2109(c); *2014 Auction Notice*, 29 FCC Rcd. at 8417 ¶ 101 n.180; Oral Arg. Tr. 32:19–22.  They then bore the burden of proving their status as genuinely independent very small businesses to obtain bidding credits.  Having failed in that task, *SNR Wireless*, 868 F.3d at 1025, they were entitled on remand only to a second opportunity to themselves cure the problems identified.  Nothing in the regulatory scheme, past agency practice with other parties, or this court's prior opinion obligated the Commission to work hand in glove with the Companies to draft their blueprint for independence.

**B**

On the merits, the Commission reasonably found that DISH continues to exercise *de facto* control over the Companies.  The agency grounded its decision on three settled agency rulings.  First, under *Baker Creek*, DISH's veto powers, though trimmed from the prior agreements, continued to materially dominate the Companies' business decisions.  *See 2020 Order*, 35 FCC Rcd. at 13340 ¶¶ 70–71.  Second, under the Commission's *Fifth Memorandum Opinion & Order*, SNR and Northstar were still financially compelled to sell

---

[11] *Compare* November 4 Meeting Letter, *supra*, and November 17 Meeting Letter, *supra*, *with* Companies Opening Br. 31–32 & nn.11–13.

themselves to DISH. *Id*. at 13357–13362 ¶¶ 124–146. Third, the *Intermountain Microwave* factors again pointed to DISH's *de facto* control. *Id.* at 13341–13357 ¶¶ 72–123. Those conclusions by the Commission were reasoned, supported by substantial evidence, and consistent with agency precedent.

**1**

The Commission's conclusion that DISH's revised investor protections "reinforce[d]" its control over the Companies was sound. *2020 Order*, 35 FCC Rcd. at 13340 ¶ 69. The Commission acknowledged that SNR and Northstar's new agreements had whittled down the number of DISH's veto powers over the Companies' business decisionmaking. *Id.* at 13338–13339 ¶ 65. But focusing on quality rather than quantity, the Commission concluded that DISH retained—and, in one critical respect, expanded—its power to control vital business decisions going to the Companies' *raison d'etre*: developing and using the wireless spectrum they had purchased. *Id.* at 13340–13341 ¶¶ 69–71.

Under *Baker Creek*, the agency may deem a small company independent even if an investor retains "a decision-making role * * * in major corporate decisions that fundamentally affect[s] [the investor's] interests." 13 FCC Rcd. at 18714–18715 ¶ 9. *Baker Creek* identified six business decisions in which investors in small businesses typically "may" participate without being found in *de facto* control:

> (1) [the] issuance or reclassification of stock; (2) setting compensation for senior management; (3) expenditures that significantly affect market capitalization; (4) incurring significant corporate debt or otherwise encumbering corporate assets; (5) sale of major corporate assets; [and] (6) fundamental changes in corporate structure.

*Baker Creek*, 13 FCC Rcd. at 18715 ¶ 9; *see also 2015 Order*, 30 FCC Rcd. at 8913 ¶ 60.

The *Baker Creek* decision cautioned, though, that "[i]nvestment protection provisions may confer actual control upon [an investor] where they give it the power to dominate the management of corporate affairs." 13 FCC Rcd. at 18714 ¶ 9.

The Commission acknowledged that many of DISH's veto powers under the amended agreements mirror the six identified in *Baker Creek*. *See 2020 Order*, 35 FCC Rcd. at 13339 ¶ 66. And the agency noted that the contracts purported to limit DISH's authority to veto the Companies' decisions only as "consistent with * * * *Baker Creek*[.]" *Id.* at 13339 ¶ 68 (citation omitted).

But the Commission found that DISH's protections, when paired with other restrictions, went too far, in two respects. *See 2020 Order*, 35 FCC Rcd. at 13340–13341 ¶¶ 69–71.

First, under the new agreements, DISH had the authority to block the Companies from "incurring any significant indebtedness[.]" *2020 Order*, 35 FCC Rcd. at 13340 ¶ 70 (internal quotation marks and citation omitted). That power "could operate to restrict the [Companies] from obtaining additional funding that is necessary for their business plans." *Id.* Constructing a nationwide wireless network is expensive, so the Commission reasonably found that these provisions empowered DISH to roadblock any of the Companies' buildout plans for the spectrum acquired at auction, unless they met with DISH's approval. *See id.* That left the Companies dependent on DISH if they wanted to use a wireless network to survive as independent businesses.

Second, the Commission found that the amendments gave DISH a whole new power—the ability to prevent the

Companies from leasing their licenses. *See 2020 Order*, 35 FCC Rcd. at 13340–13341 ¶ 71. Under the old agreements, the Companies were permitted to lease their "property or assets * * * in the ordinary course of business" without DISH's consent, as long as they did not lease "all or substantially all" of their "business or property[.]" J.A. 183, 180 (Northstar 2014 Credit Agreement §§ 6.18, 6.11(c)).[12]

Under the new amendments, by contrast, the Companies need DISH's written permission to lease any "major asset[,]" including spectrum licenses, and DISH is free to deny a request "for any reason or no reason[.]" J.A. 644, 670 (Northstar 2018 LLC Agreement §§ 6.3, 1.1); *accord* J.A. 1158, 1109 (SNR parallels). That, the Commission said, is "a critical *new* index of DISH's *de facto* control over the [Companies'] business opportunities." *2020 Order*, 35 FCC Rcd. at 13340 ¶ 71. Not only is this investor protection beyond the scope of the provisions listed in *Baker Creek*, but it also allows DISH to foreclose a critical route for the Companies to raise money: spectrum leasing. Notably, spectrum leasing is one of the approaches that the Companies' own economic expert highlighted as a pathway for SNR and Northstar to achieve their independence. *See id.* Yet that path is closed without DISH's approval.

---

[12] *Accord* First Amended and Restated Credit Agreement By and Among American AWS-3 Wireless III L.L.C. (as Lender) and SNR Wireless LicenseCo, LLC (as Borrower) and SNR Wireless HoldCo, LLC (as Guarantor), §§ 6.18, 6.11(c), FCC (Oct. 13, 2014), https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=919232078&attachmentKey=19626515&attachmentInd=applAttach, at 33, 30 (last accessed June 13, 2022) ("SNR 2014 Credit Agreement").

The Companies have three main responses, none of which succeeds.

First, the Companies contend that the amended investor protections comport with *Baker Creek*. The Commission, though, adequately explained why the agreements actually cemented DISH's *de facto* control over SNR and Northstar. In its initial 2015 decision finding *de facto* control, the Commission was concerned about limitations on the Companies' ability to borrow from third parties. *See 2015 Order*, 30 FCC Rcd. at 8924 ¶ 85. While some restrictions on raising debt "have been considered acceptable investor protections in some circumstances," the Commission reasonably found that general rule inapplicable here because the Companies' original agreements allowed them to borrow only "trivial" amounts "in comparison to the value of the[ir] spectrum[.]" *Id.*; *see also SNR Wireless*, 868 F.3d at 1033.

True, under the agreements at issue here, the parties removed the hard limit on the Companies' unsecured debt. *See 2020 Order*, 35 FCC Rcd. at 13340 ¶ 70, 13347–13348 ¶ 91. But the Commission sensibly concluded that DISH's new veto over significant debt—the lifeblood of wireless network development—"blunt[ed] the impact" of that change. *Id.* at 13340 ¶ 70.

In addition, the new leasing provisions went "beyond those identified as typical in *Baker Creek*[.]" *2020 Order*, 35 FCC Rcd. at 13340 ¶ 71. To be sure, *Baker Creek* held that it is generally permissible for non-controlling investors to be involved in a small business's decisions to sell "major corporate assets[.]" *Baker Creek*, 13 FCC Rcd. at 18715 ¶ 9. But the Commission reasonably found that DISH imposed even broader restrictions on the Companies' power to lease or assign licenses, which went too far. When combined with other

contractual conditions, DISH's new control over spectrum leasing gave it "the ability to frustrate or prevent the [Companies] from building out their networks[] [or] leasing their spectrum in any significant amount[.]" *2020 Order*, 35 FCC Rcd. at 13340 ¶ 71.

The Companies' argument that the amended agreements did not expand DISH's power to nix their leasing decisions fares no better. The prior agreements had allowed the Companies independently to lease "property or assets * * * in the ordinary course of business," though SNR and Northstar could not lease "all or substantially all" of their "business or property" without DISH's approval. J.A. 183, 180 (Northstar 2014 Credit Agreement §§ 6.18, 6.11(c)).[13] Under the amendments, the parties have materially narrowed the "ordinary course of business" exception by giving DISH a unilateral veto over the lease or transfer of any "major asset"— including spectrum licenses. J.A. 644, 670 (Northstar 2018 LLC Agreement §§ 1.1, 6.3); *accord* J.A. 1109, 1158 (SNR parallels).

The Companies contend that the 2018 agreements did not substantively change their ability to lease licenses without DISH's consent. They point to the fact that the new agreements retained the "ordinary course of business" exception and just added on the new restriction on leasing "major asset[s.]" *See* Companies Reply Br. 16–17; J.A. 644, 670 (Northstar 2018 LLC Agreement §§ 1.1, 6.3); *accord* J.A. 1109, 1158 (SNR parallels). This, the Companies argue, shows that leasing a major asset such as a spectrum license was unlikely ever to be within the ordinary course of business.

---

[13] *Accord* SNR 2014 Credit Agreement §§ 6.18, 6.11(c), at 33, 30.

But DISH's right hand took away what the left hand gave: Its sweeping new veto power over the lease of any major asset extinguished the force of the previously viable "ordinary course of business" exception. So the Commission reasonably concluded that the leasing restriction was a new and material form of control. *See 2020 Order*, 35 FCC Rcd. at 13340–13341 ¶ 71.[14]

Finally, the Companies are not saved by the clauses in their agreements limiting DISH's investor protections to those "consistent with the [agency's] decision in *Baker Creek*[.]" J.A. 641 (Northstar 2018 LLC Agreement § 1.1); *accord* J.A. 1107 (SNR parallel). What matters in the Commission's *de facto* control analysis is "the substance of the terms of DISH's control"—where the rubber meets the road in DISH's actual reserved authority—not "formal recitations of compliance" with the generic language of Commission orders. *SNR*

---

[14] The Companies' own expert declarant undermines their argument that leasing licenses would "almost certainly" have been outside of the ordinary course of business. Companies Reply Br. 17. She averred that leasing spectrum was a leading business option for SNR and Northstar, *see* J.A. 1550 (Taylor Decl.), as did the Companies' agreements with DISH, *see* J.A. 632 (Northstar 2018 LLC Agreement § 1.1, defining "Business"); J.A. 1093 (SNR parallel). As the Companies' own statements indicate, such basic business opportunities are part of the "ordinary course of business" of spectrum license holders. Or so the Commission could reasonably conclude. *See* U.C.C. § 1-201(b)(9) (American Law Inst. & Uniform Law Comm'n 2021) (Uniform Commercial Code stating that "[a] person buys goods in the ordinary course" when a purchase "comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices"); BLACK'S LAW DICTIONARY 404 (9th ed. 2009) (defining "course of business" as the "normal routine in managing a trade or business"); 3 COLLIER ON BANKRUPTCY ¶ 364.02 (16th ed. 2022).

*Wireless*, 868 F.3d at 1033; *see also 2020 Order*, 35 FCC Rcd. at 13339 ¶ 68. Tellingly, the Companies' counsel conceded at argument that, even with this clause in place, they expected the Commission, in its bidding credits decision, to do the enforcing for them by bringing the contracts into compliance with *Baker Creek*. *See* Oral Arg. Tr. 34–38. Because the Commission was not required "to permit a cure[,]" let alone to craft it for them, the Companies could not reasonably expect the agency to devote its energies to securing their independence through an ongoing process of superintending DISH through piecemeal enforcement actions. *SNR Wireless*, 868 F.3d at 1046.

**2**

The Commission also reasonably grounded its finding of *de facto* control in its *Fifth Memorandum Opinion & Order*. In that Order, the Commission explained that when a company is "financially * * * forced" to sell itself to an investor, the investor has *de facto* control. *See SNR Wireless*, 868 F.3d at 1034–1035, 1040 (formatting modified) (quoting *Fifth MO&O*, 10 FCC Rcd. at 456 ¶ 96). The record supports the Commission's conclusion that the revised agreements, while moderated in some respects, nevertheless continued to apply unrelenting financial pressure on SNR and Northstar to sell themselves to DISH.

Under the new agreements, the Companies each had two 90-day windows—one starting in 2020 and the second in 2021—during which they could require DISH to buy them for handsome profits. *See 2020 Order*, 35 FCC Rcd. at 13358–13359 ¶¶ 128–130. After that, the Companies only had a right to request that DISH buy them at their fair market value. And DISH could refuse.

Those two purchase windows were keyed to the point in time when Commission rules would require the Companies to

make use of their spectrum licenses or face weighty and escalating financial consequences. As the Commission explained, its regulations require that licensees in relevant bands provide "reliable signal coverage" to at least 40% of the population in their regions within six years of receiving their licenses. 47 C.F.R. § 27.14(s)(1); *see also 2020 Order*, 35 FCC Rcd. at 13347 ¶ 90 & n.207. That means that the Companies had to offer extensive wireless coverage in many of their license areas by 2021, right at the start of their second put window. If they failed to meet that deadline, the Companies' timeline for providing service to 75% of the population in their coverage area would accelerate by two years, to 2025. *See 2020 Order*, 35 FCC Rcd. at 13347 ¶ 90 & n.207; *see also* 47 C.F.R. § 27.14(s)(2)–(3). If the Companies missed that target, their licenses would be revoked. *See* 47 C.F.R. § 27.14(s)(2)–(4); *cf. 2015 Order*, 30 FCC Rcd. at 8930 ¶ 104 n.313 (Commission citing this rule in its 2015 put-option analysis). Each of the Companies' $500 million in debt plus accrued interest was also to come due in 2025. *See 2020 Order*, 35 FCC Rcd. at 13349–13350 ¶ 99. And throughout, the Companies have owed DISH at least 8% annual dividends on billions of dollars in preferred equity, which they either had to pay in cash or add to their already sizable final tab due immediately upon a merger with any party other than DISH. *Id.* at 13350 ¶¶ 99–100, 13354–13355 ¶ 114.

Through the amended agreements, DISH presented both Companies a financial lifeline in the face of acute financial pressure: A "generous" price offered in both windows of time for exercising their puts that guaranteed investors "healthy, above-market returns even if they have not constructed networks or repaid their loans (*i.e.*, with virtually zero risk)." *2020 Order*, 35 FCC Rcd. at 13358–13359 ¶ 130.

And DISH threw that lifeline out right when a flood of operational obligations would arise, with accumulating debt hard on their heels. If they declined the rescue, the Companies faced a formidable stick in the form of massive financial and regulatory obligations that DISH could prevent them from meeting by blocking both Companies' ability to build a wireless network or lease spectrum. In other words, DISH's powers set the Companies up to be financially stranded with no viable route to pay off their debts other than selling out to DISH. *See 2020 Order*, 35 FCC Rcd. at 13359 ¶¶ 131, 133–134.

Nor could the Companies realistically sell themselves to anyone else. The agreements empowered DISH to veto sales to the most likely buyers—its own competitors. *See 2020 Order*, 35 FCC Rcd. at 13359–13360 ¶ 135. Further shrinking the prospects of a non-DISH merger, the agreements also provided that if either SNR or Northstar sold itself to anyone but DISH, it would immediately owe DISH the full multi-billion-dollar value of its outstanding debt and preferred equity. *See id.*; *see also id.* at 13354–13355 ¶ 114.

As the Commission adequately explained, the Companies' slightly longer windows to obtain a DISH buyout under the revised agreements did not change the fundamental economics of the pressure to sell, and to sell to DISH alone. *See 2020 Order*, 35 FCC Rcd. at 13360 ¶ 136. The agreements left the Companies with the Hobson's choice of making a riskless sale with above-market returns, or else attempting a risky, debt-laden venture over which DISH had essential veto powers. *See id.* at 13358–13360 ¶¶ 130–136.

The amended contracts' new option for DISH to buy the Companies starting in 2022 at fair market value did nothing to lessen the pressure. By that point, the Commission reasoned,

DISH would have no obligation to buy the Companies—it could simply walk away. So that provision hardly reduced the financial pressure on the Companies to take one of the earlier-expiring, generous, and risk-free buyouts. *See 2020 Order*, 35 FCC Rcd. at 13360 ¶ 137. The Commission sensibly found that the contractual provisions once more gave SNR and Northstar "every incentive simply to sell their interests * * * to DISH in exchange for complete forgiveness of th[eir] loans plus a guaranteed cash payment." *SNR Wireless*, 868 F.3d at 1040.

The Companies respond that the Commission gave scant heed to their ability to become successful independent businesses, and so to avoid the temptation to sell themselves. Not so. The Commission fully explained its contrary judgment. *2020 Order*, 35 FCC Rcd. at 13360–13362 ¶¶ 138–146.

The Companies' argument relies heavily on the analysis of their expert, Carlyn Taylor. She posited that SNR and Northstar had three "viable potential business options" to pursue other than selling themselves to DISH. J.A. 1548. Those were (i) "deploying a wireless network"; (ii) "offering access to the[ir] spectrum * * * via a spectrum sharing model, including spectrum leasing"; and (iii) "offering wireless network capacity or roaming on a wholesale basis[.]" J.A. 1550. Taylor concluded that if the value of the Companies' spectrum licenses grew faster than their financial obligations to DISH, they could reasonably decide not to exercise their put options. J.A. 1549–1550. Taylor added that about half of the Companies' licenses were in bands that had grown in value and could fruitfully be paired with spectrum controlled by DISH. J.A. 1552.

The Commission was unpersuaded, and for good reason. It explained that Taylor had not considered the Companies' failure to monetize their assets even as their financial obligations had piled up. *See 2020 Order*, 35 FCC Rcd. at 13361 ¶ 141. If the Companies believed they could rationally pay their dues to DISH, they would presumably be looking for money to do so. But there was no evidence they had taken any steps to generate income. *Id.* Instead, both firms had left their valuable spectrum "lying fallow[.]" *Id.* at 13361–13362 ¶ 144 n.294 (citation omitted).

The Commission also pointed out that Taylor underplayed DISH's power to hobble the Companies' business prospects, and, in that way, coerce them into selling. *2020 Order*, 35 FCC Rcd. at 13361–13362 ¶¶ 142, 146. If SNR or Northstar tried to construct a network or lease their spectrum to other carriers— as all three of Taylor's options assumed they could do—DISH could cut them off, either by starving them of buildout funds or vetoing their leasing decisions. *Id.* at 13361–13362 ¶¶ 143–145; *see also id.* at 13353 ¶ 109.

Lastly, the Commission pointed out that Taylor's finding that the Companies' licenses paired particularly well with DISH's spectrum hardly suggested that they had the capacity to go it alone. *2020 Order*, 35 FCC Rcd. at 13361–13362 ¶ 144.

SNR and Northstar object that the Commission ignored a path to profitability that did not involve leasing their spectrum. But the Commission sufficiently examined the Companies' business options. One possibility the Companies raise in their briefing—making money by pairing their licenses with broadcasters' spectrum—was mentioned by their expert only in a cursory footnote. And the agency adequately explained that if either SNR or Northstar tried this approach, DISH could

veto it too. *See 2020 Order*, 35 FCC Rcd. at 13362 ¶ 144 n.297.

Neither did the Commission need to say more about the Companies' claim that they could pursue a "spectrum sharing model" without leasing. Companies Opening Br. 47 (quoting J.A. 1550). The only mechanism Taylor mentioned for sharing spectrum was leasing, which DISH could quash. And the Companies' attempt to supplement Taylor's report in their briefing is too little too late as our review is confined to the record before the agency at the time of its decision. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 959 (D.C. Cir. 2016).

In any event, the only question before us is whether the Commission's decision fell within the realm of reason, not whether other judgments could have been made. *See EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006). The Commission's conclusions meet that mark.[15]

**3**

The Commission's conclusion that, taken together, the six *Intermountain Microwave* factors indicated *de facto* control was likewise proper. Those factors are:

> (1) who controls the daily operations of the small business;
> (2) who employs, supervises, and dismisses the small

---

[15] The Companies argue that the Commission arbitrarily foreclosed consideration of Taylor's testimony. While the Commission initially found the arguments in Taylor's put-option analysis precluded by *SNR Wireless*, it went on to explain over eight paragraphs why it found Taylor's report "both speculative and conclusory—and ultimately unpersuasive." *2020 Order*, 35 FCC Rcd. at 13360–13362 ¶¶ 139–146. That is sufficient consideration.

business's employees; (3) whether the small business has "unfettered" use of all its facilities and equipment; (4) who covers the small business's expenses, including its operating costs; (5) who receives the small business's revenues and profits; and (6) who makes and carries out the policy decisions of the small business.

*SNR Wireless*, 868 F.3d at 1031.

**a**

On the first factor, the Commission held that the Companies had not "fully resolved" its concern that DISH controlled their daily operations. *2020 Order*, 35 FCC Rcd. at 13341 ¶ 75. The revised contracts did eliminate some of the Commission's earlier concerns by ending the Management Services Agreements, scrapping the mandatory business plan consultations with DISH, and "clarif[ying]" that the management fee provisions did not limit employee compensation. *Id.* at 13341 ¶ 74.

The problem is, as the Commission explained, that the revised agreements perpetuated five-year business plans that had been crafted under DISH's supervision and which were still in force at the time of the amendments. *See 2020 Order*, 35 FCC Rcd. at 13342 ¶ 75. Because the parties could only modify the five-year plans if a "material change[] affecting" the Companies occurred, the Commission concluded that SNR and Northstar remained "locked in to the business plans prepared during DISH's *de facto* control." *Id.* at 13341–13342 ¶ 75.

The Companies counter that by the time the agency issued its decision in 2020, those business plans had lapsed. That is true. The Companies further argue that the prior business plans did not predetermine future plans because the revised

agreements deleted a provision requiring that new plans "be as consistent as practicable with the prior" document. J.A. 671–672 (Northstar 2018 LLC Agreement § 6.5(a)); *accord* J.A. 1162 (SNR parallel). Also true. We agree with the Companies that the agency was mistaken when it said that they were "locked in" to business plans prepared under the old regime. *2020 Order*, 35 FCC Rcd. at 13342 ¶ 75.

Still, it was reasonable for the Commission to find that DISH continued to materially influence the Companies' daily operations in the period between the 2018 amendments and the termination of the old business plans. And we cannot say that it was arbitrary for the agency to find it significant that the Companies had chosen not to unwind those old plans.

In any event, the Commission did not lean on this daily-control prong when finding *de facto* control. It said instead that this factor did not "support[] the [Companies'] position." *2020 Order*, 35 FCC Rcd. at 13342 ¶ 77; *see also id.* at 13338 ¶ 63 (recognizing that the Companies' amendments "eliminate some of the prior identified concerns regarding DISH's control over * * * aspects of the [Companies'] daily operations"). So the agency's "relatively thin" reasoning here does not render its entire *Intermountain Microwave* analysis unreasonable, as its consideration and balancing of the other factors shows. *SNR Wireless*, 868 F.3d at 1032; *see also* 5 U.S.C. § 706 (in Administrative Procedure Act review, the court shall take "due account * * * of the rule of prejudicial error").

**b**

On the second and third factors, the Commission agreed with the Companies that the revised agreements had addressed its prior concerns by ending the management agreements and deleting provisions giving DISH authority over employment

decisions and technology choices. *See 2020 Order*, 35 FCC Rcd. at 13342–13343 ¶¶ 77–78, 13357 ¶¶ 121–123.

**c**

The Commission found that, under the fourth *Intermountain Microwave* factor, DISH continued to dominate the Companies' finances. *See 2020 Order*, 35 FCC Rcd. at 13343–13348 ¶¶ 80–92. Even though the amendments eliminated some of the problems in the original agreements, the Commission reasonably concluded that the Companies remain fundamentally dependent on DISH for financing because DISH controls whether the Companies can access sufficient funds to build a national network and from whom they can seek that funding. *Id.* at 13344 ¶¶ 82–83.

To start, DISH committed to lending the Companies "reasonable" sums to build a telecommunications system, but then capped its financing obligations at an amount that the Commission found grossly unequal to the task. *See 2020 Order*, 35 FCC Rcd. at 13345–13346 ¶¶ 84, 86–89. To be sure, for Northstar—but not for SNR—DISH also agreed to lend the company enough money to meet its "Working Capital requirements." *Id.* at 13346 ¶ 88 (quoting Northstar 2018 Credit Agreement § 2.2(b)(i)). The Commission explained that such support was not enough because working capital loans are typically used for short-term needs, not to finance long-term investments like a wireless network. *See id.* Those provisions left the Companies unable to rely on DISH to fund the construction of the national networks that provided a critical path to paying off their debt and making profitable use of their spectrum licenses. *Id.* at 13346 ¶¶ 88–89.

The Commission also sensibly found that DISH's new power to block the Companies from incurring "significant" indebtedness financially tethered SNR and Northstar to DISH.

*2020 Order*, 35 FCC Rcd. at 13347–13348 ¶¶ 91–92 (citation omitted).

The Commission also found that the funding framework adopted by the Companies mirrored that in *Baker Creek*. *See 2020 Order*, 35 FCC Rcd. at 13348 ¶ 92. There, the agency found that an investor exercised *de facto* control over a small company's finances because it was the source of almost all the small business's capital, and it could control both who funded it and in what amounts. *See Baker Creek*, 13 FCC Rcd. at 18721–18723 ¶¶ 23–25. So too here: Under the revised agreements, DISH can block the Companies from most outside borrowing and need not lend to the Companies in adequate amounts itself. *See 2020 Order*, 35 FCC Rcd. at 13348 ¶ 92.

**d**

Turning to the fifth *Intermountain Microwave* factor, the Commission's finding that DISH was likely to vacuum up the Companies' revenues and profits was well-supported in the record. *See 2020 Order*, 35 FCC Rcd. at 13348–13351 ¶¶ 93–103. In looking at the changes made by the amended contracts, the Commission "conclude[d] that the parties [had] changed the form but not the controlling nature of DISH's financial interests[.]" *Id.* at ¶ 98.

Critically, in 2020, the Companies still faced massive debt obligations to DISH. *2020 Order*, 35 FCC Rcd. at 13349–13350 ¶¶ 97–100. And DISH held the ability to prevent the Companies from "generat[ing] revenues to pay down their debt and make their required dividend payments." *Id.* at 13351 ¶ 102. If the Companies could not make their payments, any profits they generated would likely benefit only DISH, which could force SNR and Northstar to sell themselves to it. *Id.* at ¶¶ 102–103 & n.237.

The Companies contend that the Commission ignored the relative modesty of their debts compared to the value of their licenses, and so exaggerated DISH's ability to seize their profits. But the Commission adequately considered the value of those licenses, explaining that (i) DISH can prevent the Companies from profiting from, or significantly borrowing based on, their spectrum, making the $500 million loans difficult or impossible to pay back, and (ii) if either firm wishes to merge with a party other than DISH, it will immediately have to repay DISH billions of dollars. *See 2020 Order*, 35 FCC Rcd. at 13340 ¶ 70, 13350–13351 ¶¶ 100–103, 13354–13355 ¶ 114.

**e**

As to the last *Intermountain Microwave* factor, the Commission found that DISH continued to dominate the Companies' decisionmaking. *See 2020 Order*, 35 FCC Rcd. at 13351–13357 ¶¶ 104–120. While the amended agreements addressed some of the Commission's prior concerns about DISH's control, the agency concluded that SNR and Northstar's new "rights [were] mere fig leaves" because DISH could, by blocking their credit lines and leasing revenue, prevent them from making money. *Id.* at 13353–13354 ¶¶ 109–110. The Commission also found that DISH could still "influence if, how, [and] when * * * [the Companies and their managing investors] exit the business" because the Companies would have little choice but to take the generous guaranteed buyouts offered under the agreements. *2020 Order*, 35 FCC Rcd. at 13354 ¶¶ 111–112 (emphasis omitted).

Finally, the Commission determined that the Companies were still "functioning as arms of DISH, rather than as independent small companies[.]" *2020 Order*, 35 FCC Rcd. at 13355 ¶ 115 (formatting modified; quoting *SNR Wireless*, 868

F.3d at 1025). In 2015, the Commission was troubled by the Companies' joint bidding behavior in the spectrum auction. *SNR Wireless*, 868 F.3d at 1042. Yet nothing seemed to change on remand. SNR and Northstar continued to act in concert by amending their agreements with DISH in "virtually identical" fashion. *2020 Order*, 35 FCC Rcd. at 13355–13356 ¶¶ 115–119. Though Northstar had borrowed almost $2 billion more from DISH than SNR had, both reduced their DISH debts to exactly $500 million apiece in exchange for preferred equity. *Id.* at 13356 ¶ 118.

On top of that, despite Northstar's more valuable spectrum holdings, the Companies agreed to similar limits on their ability to borrow from DISH to finance network construction. *See 2020 Order*, 35 FCC Rcd. at 13356 ¶ 118. The Companies' put rights were also virtually identical, and both firms gave DISH the same expanded veto over spectrum leasing. *See id.* at ¶ 119 & n.264. On this record, the Commission reasonably found that SNR and Northstar, rather than acting like individual businesses with their own interests and identities, only pantomimed independence, while functionally operating at DISH's beck and call.

The Companies argue that it was natural to amend their agreements with DISH in similar ways. That is because the Commission and this court found their previous agreements wanting for identical reasons, so a common response was appropriate.

While that could explain the Companies' similar *structural* changes to their agreements, it does not address their acquiescence in identical numerical amendments, such as converting all but $500 million in debt into preferred equity. *See 2020 Order*, 35 FCC Rcd. at 13356 ¶ 118. That entailed converting approximately $1.8 billion more of Northstar's debt

to equity than SNR's. Yet the Companies offer no reason for slashing their differing debts to the exact same dollar amount.

The Companies' second explanation for proceeding in lockstep—that they could jointly "deploy a nationwide network"—also falls flat. Companies Opening Br. 53 (citation omitted). Even if the Companies were planning such a joint venture—and they point to no evidence that they were—they fail to explain why that would motivate them to craft nearly mirror-image agreements with DISH.

**f**

SNR and Northstar mount two more general attacks on the Commission's *Intermountain Microwave* analysis. Neither is persuasive.

First, the Companies complain that the Commission's decision was arbitrary because it did not find that all six *Intermountain Microwave* factors favored its ultimate control finding. The Commission, though, has not required "a finding of control with regard to all *Intermountain Microwave* factors" to conclude that a small company is *de facto* controlled by another entity. *2015 Order*, 30 FCC Rcd. at 8911 ¶ 56 n.202. Instead, the agency "carefully examines the totality of the facts and circumstances of each case" and "view[s] [the *Intermountain Microwave* factors] together[.]" *Id.* at 8909–8910 ¶ 50, 8911 ¶ 56 n.202.

Second, SNR and Northstar contend that the Commission's *Intermountain Microwave* analysis rested on the false premise that DISH's right to veto leases was materially different from the initial contracts. As already explained, the record fully supports the Commission's conclusion that the constraints on leasing were newly and consequentially expanded. *See* Section III.B.1, *supra*.

43

* * * * *

As we held in the Companies' prior appeal, so too here the Commission closely examined the Companies' agreements, applied settled agency precedent, and, after weighing the prescribed factors, reasonably explained its conclusion that DISH continues to "control and benefit from virtually all critical aspects of SNR and Northstar's businesses." *SNR Wireless*, 868 F.3d at 1033. To put the point more simply, the Commission's finding that the Companies are not entitled to very-small-business bidding credits was reasoned and squarely grounded in the record.

**C**

**1**

The Companies separately argue that they lacked fair notice of the standards that the Commission applied in finding DISH's *de facto* control, and so they should not be subject to the agency's denial of their bidding credits and default penalties. They point out that they removed the contractual provisions of greatest concern to the Commission in 2015, and so could not have reasonably predicted the agency's adverse decision.

For the record, the Companies did not just subtract provisions of concern. They also added new ones, some of which the Commission reasonably found to substantially solidify DISH's control. *See 2020 Order*, 35 FCC Rcd. at 13340–13341 ¶ 71, 13355 ¶ 115.

In any case, a party has fair notice when, "by reviewing the regulations and other public statements issued by the agency," it can "identify, with ascertainable certainty, the standards with which the agency expects parties to conform."

*General Elec. Co. v. Environmental Protection Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (internal quotation marks and citation omitted); *see also Otis Elevator Co. v. Secretary of Lab.*, 762 F.3d 116, 125 (D.C. Cir. 2014). The record in this case establishes that the Companies had fair notice of the legal rules and factors that led to the Commission's finding of *de facto* control.[16]

First, as we previously held, the Commission's decision was "clearly presaged" by the *Fifth Memorandum Opinion & Order* issued in 1994. *SNR Wireless*, 868 F.3d at 1035. In that Order, the Commission was direct and explicit that "agreements between [small businesses] and strategic investors that involve terms * * * that cumulatively are designed financially to force the [small business] into a sale * * * *will* constitute a transfer of control under our rules." *Fifth MO&O*, 10 FCC Rcd. at 456 ¶ 96 (emphasis added). The Commission's paradigm example of such ensnaring conditions was a contract that offered the small business a temporary right to sell itself debt-free to its large investor around the time it would otherwise have to start paying back its loans. *Id.* at 455–456 ¶ 95; *see also* 47 C.F.R. § 1.2110(c)(2)(ii)(A)(*2*) (providing that the Commission will analyze put options as if already exercised when "such ownership interests, in combination with other terms * * * deprive an otherwise qualified applicant * * * of *de facto* control" over its own operations). The agreements at issue here parallel that model by combining brief windows for the Companies to take guaranteed payouts from their

---

[16] We need not decide whether the Commission's denial of bidding credits alone was a punishment because the default penalties—which the Commission has not rescinded—were. *See SNR Wireless*, 868 F.3d at 1045. So the agency was required to give the Companies fair notice before applying its remedy here. *See id.* at 1043.

dominant investor or face looming—and overwhelming—financial obligations.

Second, the Commission doubled down on that point in its *2015 Order*. The agency stated directly that because the Companies were "committed to repayment terms that [would] be difficult, if not impossible to manage unless they exercise[d] their put option[s,]" the contracts placed undue pressure on Northstar and SNR "to refinance or exit the[ir] business[es]," and "thereby exhibit[ed] an unacceptable degree of control on DISH's part." *2015 Order*, 30 FCC Rcd. at 8930 ¶ 105. Also in 2015, as in 2020, the Commission cited the Companies' license-deployment deadlines—timed closely to the relevant put options—as adding pressure on SNR and Northstar to sell themselves to DISH. *Compare 2015 Order*, 30 FCC Rcd. at 8930 ¶ 104 n.313, *with 2020 Order*, 35 FCC Rcd. at 13347 ¶ 90 & n.207. So the Companies had ample notice that the agreements' pairing of an approaching and seemingly insurmountable financial commitment with irresistible get-out-of-debt-free cards from DISH would lead to a finding of *de facto* control.

The Companies also had the benefit of our 2017 decision reinforcing that warning. We sustained the Commission's finding of *de facto* control there because DISH gave the Companies a non-choice between undertaking "the quixotic mission of generating enough revenue to pay back their multibillion dollar loans" within five to seven years—well before they could realistically earn sufficient sums by building out their networks—or selling themselves to DISH "in exchange for complete forgiveness of those loans plus a guaranteed cash payment." *SNR Wireless*, 868 F.3d at 1040. Under Commission precedent, those conditions "financially * * * forced" the Companies to exercise their put options. *Id.* (formatting modified and citation omitted).

Notably, the Commission's finding of control in 2020 turned on veto powers very similar to those that led the Commission to find *de facto* control by DISH just five years earlier. In its prior order, the Commission was concerned that DISH (i) could prevent the Companies from selling out to another buyer, (ii) had no obligation to lend them adequate financing, and (iii) could seize the Companies' licenses. *2015 Order*, 30 FCC Rcd. at 8930–8931 ¶ 105. Under the amended agreements, the Commission found that DISH still could thwart the Companies' ability to sell their interests to third parties, to access sufficient financing, or to profit from their spectrum rights. *See 2020 Order*, 35 FCC Rcd. at 13359–13360 ¶¶ 131–137. So while the Companies and DISH had modified their contracts' bells and whistles, they retained the same essential structure that the Commission had long said—and had just told them, with our affirmation—is a signature form of *de facto* control. *See Fifth MO&O*, 10 FCC Rcd. at 455–456 ¶¶ 95–96.

Third, the Commission's *Baker Creek* and *Intermountain Microwave* decisions provided further notice that the Companies' overwhelming financial and decisionmaking dependence on DISH, coupled with its restrictive investor protections, would support a finding that DISH is in *de facto* control.

*Baker Creek* said that when investor protections provide "the power to dominate the management of corporate affairs[,]" such provisions "may confer actual control upon" the purportedly passive investor. *Baker Creek*, 13 FCC Rcd. at 18714–18715 ¶ 9. That decision expressed particular concern that the investor at issue, which was "the source of all but a negligible amount of [the small business's] capital[,]" could control how much the small business borrowed, and from whom. *Id.* at 18721–18722 ¶¶ 23–24. *Baker Creek* held that

terms barring the small business from taking out secured debt and giving the investor a right of first refusal over outside loans went "beyond permissible investment protections" when considered alongside other provisions. *Id.* at ¶ 24.

That gave fair notice of the Commission's similar finding here that the investor protection provisions in the Companies' agreements with DISH "reinforce[d]" its control over SNR and Northstar. *2020 Order*, 35 FCC Rcd. at 13340–13341 ¶¶ 69–71. DISH's power to veto significant loans ensured that DISH, as the undisputed source of almost all the Companies' capital, kept their borrowing under its thumb. *Id.* at 13340 ¶ 70. And DISH's ability to prevent the Companies from leasing spectrum, which substantially increased their financial dependence and went "beyond [provisions] identified as typical in *Baker Creek*[,]" veered outside of the control lines drawn in Commission precedent. *Id.* at ¶ 71; *see also Fifth MO&O*, 10 FCC Rcd. at 449 ¶ 82 ("[W]hile certain provisions benefitting [purportedly passive] investors may not give rise to a transfer of control when considered individually, the aggregate effect of multiple provisions could be sufficient to [transfer] *de facto* control, particularly if the terms of such provisions vary from recognized standards.").

Likewise, the Commission's *2015 Order* in this case foreshadowed its application of the *Intermountain Microwave* factors in its decision here. The *2015 Order* told SNR and Northstar that their abject financial dependence on DISH, paired with DISH's ability to dictate how they borrow money, use their licenses, build their networks, and sell their businesses, provided powerful evidence that they were not freestanding small companies. *See* 30 FCC Rcd. at 8911 ¶ 54, 8923–8925 ¶¶ 84–86, 8925–8926 ¶¶ 87–90, 8927–8929 ¶¶ 94–101.

On remand, the Commission found no material loosening of the Companies' financial handcuffs. *See 2020 Order*, 35 FCC Rcd. at 13343–13348 ¶¶ 80–92, 13349–13351 ¶¶ 98–103 & n.237, 13353 ¶ 108. The Commission had also warned the Companies in 2015 that if they furthered DISH's interest at their own expense, the natural inference was that they were its creatures. *See 2015 Order*, 30 FCC Rcd. at 8931–8932 ¶¶ 109–114. Despite that advice, the Companies again marched to DISH's beat on remand, rewriting their contracts in preternaturally parallel fashion. *See 2020 Order*, 35 FCC Rcd. at 13355–13356 ¶¶ 115–119.

In short, the Commission gave the Companies comprehensible and actionable guidance about the standards it would apply to determine if they were independent, very small businesses or were instead under the *de facto* control of DISH. Fair notice requires no more. *See Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551, 1558 (D.C. Cir. 1987) ("If a [regulated party] ignores or fails to understand reasonably comprehensible requirements, [it] cannot be heard to complain about lack of notice.") (citation omitted); *see also Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1060 (D.C. Cir. 2007).[17]

To be clear, because the Commission's order independently rested on two grounds—the put-option analysis under the *Fifth Memorandum Opinion & Order* and the multifaceted considerations prescribed by *Intermountain Microwave* and *Baker Creek*—the Commission's decision would stand as long as the Companies were "able to identify, with ascertainable certainty" how either standard worked. *General Elec. Co.*, 53 F.3d at 1329 (internal quotation marks

---

[17] *Cf.* November 4 Meeting Letter, at J.A. 1596 n.17 (Companies' counsel citing *Maxcell Telecom* for this court's fair notice standard); *accord* November 17 Meeting Letter, at J.A. 1621 n.27.

and citation omitted); *see 2020 Order*, 35 FCC Rcd. at 13357 ¶ 124.  That they had fair notice of both is icing on the cake.

**2**

The Companies press two more fair-notice arguments. Neither has merit.

**a**

To start, SNR and Northstar contend that, because the Commission has never before denied bidding credits to an entity lacking a management agreement with its large investor, they were not given fair notice that the agency would do so here.  But no Commission precedent said that such an agreement was a necessary precondition to finding *de facto* control.  To the contrary, in the *Fifth Memorandum Opinion & Order*, the Commission illustrated its concern about put options with an example that did not involve management contracts at all.  *See Fifth MO&O*, 10 FCC Rcd. at 455–456 ¶ 95.

More to the point, in the prior decisions as to these very parties, both the Commission and this court found that the Companies' put options, in combination with other terms, demonstrated DISH's *de facto* control—all without relying on the (now-defunct) Management Services Agreements.  *See 2015 Order*, 30 FCC Rcd. at 8929–8931 ¶¶ 102–105; *SNR Wireless*, 868 F.3d at 1034–1035, 1040.

**b**

The Companies separately argue that a contradictory decision by the Wireless Bureau left them without fair notice.  They point to the Bureau's decision to grant bidding credits to Advantage Spectrum, L.P., an entity bound by restrictive

agreements with a large investor, in an unexplained decision issued after the *2015 Order*. *See Wireless Telecommunications Bureau Grants AWS-3 Licenses in the 1695-1710 MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, 31 FCC Rcd. 7129 (2016); J.A. 1637–1642 (SNR and Northstar presentation to Commissioners comparing their agreements with those of other bidders). While they acknowledge that the Bureau's actions are not binding on the Commission, SNR and Northstar argue that the Advantage Spectrum decision shows the type of "confusion at the ground level" sometimes present when fair notice is lacking. *SNR Wireless*, 868 F.3d at 1045 (internal quotation marks and citation omitted).

The Commission responds that it is not bound by staff decisions, and parties should not count on it to follow the Wireless Bureau's lead. *See 2020 Order*, 35 FCC Rcd. at 13364–13365 ¶¶ 152–157.

On this record, that wholly unexplicated ruling by the Bureau does not change the fair notice calculus. The clarity of the Commission's precedent, as applied here, the concrete guidance in the *2015 Order* and *SNR Wireless*, and the absence of any contrary analysis in the Advantage Spectrum decision provided ample notice. In fact, because the Companies were afforded a chance to cure, the *2015 Order* (at the least) amounted to the type of "pre-enforcement effort[] to bring about compliance" that we have said typically "provide[s] adequate notice." *General Elec. Co.*, 53 F.3d at 1329; *accord SNR Wireless*, 868 F.3d at 1046.[18]

---

[18] Remember, the Wireless Bureau granted bidding credits to Advantage Spectrum before our court decided *SNR Wireless*, which provided the Companies with yet more analysis of the relevant *de facto* control standard.

The Companies rely on *SNR Wireless*, which found that internal inconsistency within an agency could signal a lack of fair notice. But in that case, the agency's decision to deny the Companies a chance to cure was directly undercut by a prior "Commission-level position[.]" 868 F.3d at 1046.

Here, by contrast, the agency's decision was supported, rather than undermined, by prior Commission actions and a ruling of this court. Those binding "administrative and judicial decisions"—including those directed at these very parties— "put the Compan[ies] on fair notice of what was required." *Abhe & Svoboda, Inc.*, 508 F.3d at 1060. There is "no grave injustice in holding parties to a reasonable knowledge of the law[.]" *Id.* (citation omitted).[19]

## IV

For all of those reasons, we reject the Companies' challenges to the Commission's orders.

*So ordered.*

---

[19] The Companies' argument that the Commission unlawfully discriminated between Advantage Spectrum and them is foreclosed by precedent, as is DISH's similar argument regarding both Advantage Spectrum and another bidder in the same spectrum auction. *See SNR Wireless*, 868 F.3d at 1039; *accord Amor Fam. Broad. Grp. v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1990) (Commission does not act inconsistently by failing to comport with actions of its "subordinate bod[ies]").